COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-494-CV

 

 

IN THE INTEREST OF A.D.,

A CHILD

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








After a bench trial, the trial court found by
clear and convincing evidence (1) that M.V.M. (Mother) had knowingly placed or
knowingly allowed her daughter, A.D., to remain in conditions or surroundings
that endanger the physical or emotional well‑being of the child,[2]
(2) that Mother had engaged in conduct or knowingly placed A.D. with persons
who engaged in conduct that endangers the physical or emotional well‑being
of the child[3]
and (3) that the termination of the parent‑child relationship would be in
A.D.=s best
interest.[4]  Based on the findings, the trial court
terminated Mother=s parental rights to A.D.  Mother timely appealed.  In three issues, Mother contends that the
evidence is legally and factually insufficient to support the endangerment
findings and factually insufficient to support the best interest finding.  Because we hold that the evidence is
sufficient, we affirm the trial court=s
judgment.

In its findings of fact and conclusions of law,
the trial court found, among other things, that

$                  
Mother has two other children not in her primary care;

 

$                  
Mother had admitted that her actions significantly endangered the
physical or emotional well-being of A.D.;

 

$                  
Mother had violated a safety plan Adesigned to protect the child and prevent removal
by pulling the child=s hair and being
discharged from the battered-women=s shelter in which she and the child were given
refuge@;

 

$                  
the State of Kentucky child welfare agency investigated two referrals
of abuse involving Mother and A.D.;

 

$                  
Mother had been involved in numerous relationships with Aphysically abusive
paramours@;

 

$                  
A.D. was born prematurely because of stress suffered by Mother as a
result of her relationship with a boyfriend (A.D.=s father) (AFather@);








 

$                  
A.D. was burned while in the care of Mother while they were still
living in Kentucky when another child lit a broom and swept it over A.D.=s head;

 

$                  
Mother did not seek medical attention for A.D. regarding her burn
until they arrived in Texas and Mother was directed to do so by CPS;

 

$                  
Mother has lived with A.D. in at least five different individuals= residences, a homeless
shelter, a battered women=s shelter, motels, and a
car;

 

$                  
Mother has failed to provide a safe and stable environment for A.D.;

 

$                  
Mother did not complete her family service plan and has admitted that
she did not complete the plan;

 

$                  
Mother did not actively participate in counseling services offered by
the State and was discharged due to non-attendance;

 

$                  
Mother has suffered from manic depression, attention deficit
hyperactivity disorder, borderline bipolar disorder, and anxiety and panic
attacks;

 

$                  
Mother did not access mental health treatment offered by the State;

 

$                  
Mother has had a significant, untreated lice infestation during the
pendency of this matter and chose to forgo obtaining a statement from a health
care professional indicating that the infestation was successfully treated
because doing so would have been embarrassing;

 

$                  
at the time of trial, Mother lived with a woman in
government-subsidized housing, but Mother=s name was not on the lease, she did not have a
right to reside there, and she could be asked to leave at any time;

 

$                  
Mother is not able to provide for the basic needs of A.D.;

 

$                  
Mother was not prepared to take A.D. into her primary care on the day
of trial; and








 

$                  
the State made diligent efforts to identify a relative or kinship
placement for A.D., but no suitable persons were identified.

 

The evidence shows that Mother=s
relationship with Father was filled with violence.  While Mother was seven months pregnant with
A.D., Father trapped her in a car until she threatened him with a stun gun.  Mother admitted at trial that she put A.D. in
danger at that time.  In a different
incident, when Mother was eight months pregnant with A.D., Father pushed her
against some stairs.  About a week after
A.D. was born, while they were living with Father=s
grandmother, he told Mother to leave and threatened to kill her if she took
A.D.  When A.D. was about two months old,
Father slammed Mother up against a window, and at that point, Mother broke up
with him, or, as she put it, AHe
finally let [them] free.@ 
When A.D. was about six months old, Mother allowed Father to see A.D.,
and after he had spent about twenty minutes with her, Ahe
walked up to [A.D.] like if he had a gun in his hand and pointed it straight at
her forehead.@








The testimony at trial showed that Mother has
three children, including A.D., but that none of them are currently in her
care.  Before Mother left Kentucky, she
and A.D., six months old at the time, had been living with another woman and
that woman=s six‑year‑old
son.  Mother testified that she had gone
to the bathroom, and while she was gone, the boy lit a broom on fire and passed
it over A.D.=s head, burning her.  Mother did not take A.D. to the doctor at
that time.  Instead, she took a bus to
Texas with A.D. and went to the Safe Haven shelter.

When they arrived at Safe Haven, CPS became
involved, and only at that time did Mother seek medical attention for A.D.=s
burn.  The CPS worker testified that a
hair-pulling incident resulted in a safety plan being utilized.  Contradicting Mother=s
testimony that the State removed A.D. because the Presbyterian Night Shelter
was not a safe environment for the baby, the CPS worker testified that A.D. was
removed after Mother violated the safety plan by hitting A.D. on the hand
because she dropped a sippy cup.  Mother
testified that she merely Atapped@ A.D. on
the hand.  Mother told her counselor that
A.D. knew how to Apush her buttons@ when
A.D. was seven months old.

Mother testified that once when A.D. was six
months old, Mother blacked out because she had a roommate who was Aconstantly
hollering@ at her.  Mother also testified that she was manic
depressive, had ADHD, was borderline bipolar, and had anxiety and panic
attacks.  Yet Mother delayed getting MHMR
services until near the time of trial and testified that her initial
appointment with MHMR would take place the day following trial.








Mother has not had a stable home since her
pregnancy with A.D.  During her
pregnancy, she and Father sometimes slept in the car.  After their breakup, she lived with a
roommate in Kentucky for a short period before coming to Texas when A.D. was
about six months old.  They then lived in
the Safe Haven shelter.  After Safe
Haven, Mother moved across the street to the Presbyterian Night Shelter, and
A.D. was removed.  Mother lived there for
about four months.

At some point after the removal, Mother became
romantically involved with a man, and she moved in with him.  Mother lived with him for between five and
seven months.  According to Mother, she
broke up with him after she found out that he had been stealing from his boss
and that he had a drug problem.  They
also had to leave their apartment. 
Mother had since that time been living with a woman in
government-subsidized housing.  Mother
did not know whether the woman had a CPS history or a criminal history.  Mother had been living there for about two
weeks at the time of trial.  Mother=s name
was not on the lease, and she could have been asked to leave at any time.  The CPS worker assigned to the case testified
that she did not believe that the housing would be a stable environment for
A.D. because Mother=s name was not on the lease.








Mother completed parenting classes and submitted
to a psychological evaluation.  She
attended a few counseling sessions.  At
the time of trial, Mother was not working full time.  When asked how many hours a week she worked,
she stated that she worked Aonce a
day for about two or three hours@ and
usually earned about twenty dollars per individual job.  She testified that she would get a full‑time
job if that would help her get A.D. back. 
She said that she only had a part‑time job because she could
support herself on that income while she did not have custody of A.D.; she
acknowledged that she had been told that she would probably need a full‑time
job by the date of trial.

After A.D. was removed from Mother=s care,
A.D. had repeated problems with head lice. 
CPS suspended Mother=s visits
with A.D. after Mother was determined to be the source of the lice.  Mother acknowledged that she could have had
the visits restarted by going to the health department to have her hair checked
but testified that she did not go to the health department because it would
have been embarrassing.  Mother last saw
A.D. about a month before trial.








The CPS worker testified that she believed that
Mother loved A.D. but did not have the skills to be a parent.  She further testified that Mother would stop
a visit with A.D. if A.D. appeared bored or sleepy.  The CASA worker testified that Mother and
A.D. had a bond but that Mother had not taken advantage of the services offered
to her and that if a three‑month extension were granted to her, she would
not be able to meet the CASA worker=s
expectations by that time.  Mother
acknowledged that before CPS became involved, A.D.=s life
was neither safe nor stable.

The CPS worker testified that A.D. was in the
home of dual-licensed foster parents who wanted to adopt her.  The CPS worker admitted that A.D. was doing
well when she came in to care and was developmentally on target but stated that
the baby was not very active and did not appear to have bonded.  At the time of trial, A.D. appeared to be bonding
well with the foster family, was flourishing, and had become very social.

In her first two issues, Mother contends that the
evidence is legally and factually insufficient to support the endangerment
findings under subsections (D) and (E).[5]  As we have explained in a similar case, 

Endangerment means to expose to loss or injury, to jeopardize.  The trial court may order termination of the
parent-child relationship if it finds by clear and convincing evidence that the
parent has knowingly placed or knowingly allowed the child to remain in
conditions or surroundings that endanger the physical or emotional well-being
of the child.  Under subsection (D), it
is necessary to examine evidence related to the environment of the child to
determine if the environment was the source of endangerment to the child=s physical or emotional
well-being.  Conduct of a parent in the
home can create an environment that endangers the physical and emotional
well-being of a child.

 








. . . .  Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the child=s physical or emotional
well-being was the direct result of the parent=s conduct, including
acts, omissions, and failures to act. 
Termination under subsection (E) must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.

 

To support a finding of endangerment, the parent=s conduct does not
necessarily have to be directed at the child, and the child is not required to
suffer injury.  The specific danger to
the child=s well-being may be
inferred from parental misconduct alone, and to determine whether termination
is necessary, courts may look to parental conduct both before and after the
child=s birth.  . . .  As a general rule, conduct that subjects a
child to a life of uncertainty and instability endangers the child=s physical and emotional
well-being.

 

Because the evidence pertaining to subsections 161.001(1)(D) and (E)
is interrelated, we conduct a consolidated review.[6]

 

Applying the appropriate standard of review,[7]
we hold that, based upon our review of the record, the evidence is legally
sufficient to support the trial court=s
endangerment findings regarding Mother under subsections (D) and (E).

Also applying the appropriate standard of review,[8]
we hold that the evidence is factually sufficient to support those
findings.  We overrule Mother=s first
two issues.








In her third issue, Mother contends that the
evidence is factually insufficient to support the best interest finding.  Applying the appropriate standard of review,[9]
and based upon our review of the record, we hold that the evidence is factually
sufficient to support the best interest finding.  We overrule Mother=s third
issue.

Having overruled Mother=s three
issues, we affirm the trial court=s
judgment.

PER CURIAM

PANEL:  DAUPHINOT, WALKER, and
MCCOY, JJ.

DELIVERED:  September 10, 2009











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code Ann. ' 161.001(1)(D)
(Vernon 2008).





[3]See id. ' 161.001(1)(E).





[4]See id. ' 161.001(2).





[5]See id. ' 161.001(1)(D), (E).





[6]In re J.W., No. 02-08-00211-CV,
2009 WL 806865, at *4B5 (Tex. App.CFort Worth Mar. 26, 2009,
no pet.) (mem. op.) (citations omitted).





[7]See In re J.P.B., 180
S.W.3d 570, 573B74 (Tex. 2005).





[8]See In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006); In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).





[9]See Tex. Fam. Code Ann. ' 263.307(a), (b)
(Vernon 2008); In re R.R., 209 S.W.3d 112, 116 (Tex. 2006); H.R.M.,
209 S.W.3d at 108; J.P.B., 180 S.W.3d at 573B74; C.H., 89
S.W.3d at 28; Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).